UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
THE SOFA DOCTOR, INC. d/b/a/
DR. SOFA, COUCH DOCTOR and
COUCH DOCTOR NYC,

                       Plaintiff,

            -against-                **ORDER GRANTING DEFENDANTS'
                                               PARTIAL MOTION TO DISMISS AND
                                               DENYING PLAINTIFF'S PARTIAL**
NEW YORK COUCH DOCTOR, INC.,        **MOTION TO DISMISS DEFENDANTS'
DEEVANO, INC. d/b/a/ DEEVANO                 COUNTERCLAIMS**
FURNITURE, INC., DIKO FURNITURE,
INC., SAL GIANGRANDE, DIMITRY              14-CV-05496 (PKC)
KLIPA, and DOES 1-10,

                       Defendants.

-------------------------------------------------------x

PAMELA K. CHEN, United States District Judge:

       The parties in this trademark infringement action are similarly-named competitors in the business of dissembling and reassembling couches for moving in the New York Tri-State Area. Likening its service to medical surgery, Plaintiff The Sofa Doctor, Inc. refers to itself alternately as "Dr. Sofa" and "The Sofa Doctor" in its papers and also claims to do business under the names "Couch Doctor" and "Couch Doctor NYC." Plaintiff now brings this action against two sets of defendants for their allegedly infringing use of the "Couch Doctor," "Sofa Doctor," and "Dr. Sofa" marks: (1) New York Couch Doctor, Inc. and its President, Sal Giangrande (collectively, "Couch Doctor Defendants"), and (2) Dimitry Klipa and his two companies, Deevano Inc., d/b/a Deevano Furniture, Inc., and Diko Furniture, Inc. (collectively, "Klipa Defendants").

       Plaintiff asserts ten causes of action against both Defendants under the federal Lanham Act, various New York State trademark and consumer protection statutes, and State common law.

(Dkt. 1 ("Compl.").) For their part, Couch Doctor Defendants have asserted eight counterclaims against Plaintiff, maintaining that they are the rightful owners of the "Couch Doctor" mark and accusing Plaintiff of being the one attempting to sow confusion around the "Couch Doctor" name. (Dkt. 13 ("Countercl.").) Klipa Defendants are not represented and have not yet appeared in this action.

Presently before the Court are: (1) Couch Doctor Defendants' partial motion to dismiss Plaintiff's two New York consumer protection claims (Plaintiff's Fifth and Sixth Causes of Action) (Dkt. 33); and (2) Plaintiff's partial cross-motion to dismiss Couch Doctor Defendants' two trademark fraud counterclaims (Defendants' Second and Third Counterclaims). (Dkt. 29.) For the reasons set forth below, the Court GRANTS Couch Doctor Defendants' motion and DENIES Plaintiff's cross-motion and request for oral argument (Dkt. 36). Accordingly, Plaintiff's Fifth and Sixth Causes of Action are dismissed, and discovery shall proceed on all other claims.

## BACKGROUND[1]

Plaintiff alleges that it has done business under the name "Dr. Sofa" since October 1, 2003. (Compl. ¶ 10.) It has owned and maintained the website "www.drsofa.com" since March 2003. (*Id.* ¶ 16.) In May 2004, Plaintiff incorporated under the name "The Sofa Doctor." (*Id.* ¶ 5.) In March 2006, Plaintiff registered the DR. SOFA® mark with the United States Patent and Trademark Office ("USPTO"). (*Id.* ¶ 8.) Plaintiff also claims rights in the "Couch Doctor" and "Couch Doctor NYC" marks based on: (1) its purchase of the "www.couchdoctor.com" domain

---

[1] The facts in this section are drawn from the allegations contained in the Complaint and Couch Defendants' Counterclaims (or documents attached to it or incorporated by reference), and are deemed to be true for the purposes of the parties' respective motions to dismiss under Rule 12(b)(6). *See Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) (a district court must accept the factual allegations set forth in the complaint as true, and draw all reasonable inferences in favor of the plaintiff). The Court recounts only those facts relevant to the instant motion.

name on September 24, 2003; (2) its filing of two Assumed Name Certificates for "Couch Doctor" and "Couch Doctor NYC" with the New York Secretary of State on or around May 24, 2013; and (3) its registration of the COUCH DOCTOR® mark with the USPTO on February 18, 2014, after Couch Doctor Defendants withdrew their application for the same. (*Id.* ¶¶ 11-14.) Plaintiff asserts that Couch Doctor Defendants have falsely held themselves out as Plaintiff by using the same names and marks under which Plaintiff has been doing business, including The Sofa Doctor, Dr./Doctor Sofa, Couch Dr./Doctor, and Couch Dr./Doctor NYC. (*Id.* ¶¶ 64, 81.) Plaintiff also alleges that Couch Doctor Defendants have infringed Plaintiff's rights by, *inter alia*, purchasing the domain names "nycouchdoctor.com," "couchdoctornyc.com," and "sofadoctors.com," using website designs similar to that of Plaintiff's, and manipulating search results to divert consumers away from Plaintiff's sites and to their own. (*Id.* ¶¶ 65, 70.)

Couch Doctor Defendants tell a different story. They allege that they have been using the name "New York Couch Doctor" as their identifying mark since early 2003, predating any use by Plaintiff of the "Couch Doctor" name. (Countercl. ¶¶ 10, 30-31.) Couch Doctor Defendants allege that Plaintiff originally operated under the name "Dr. Sofa" but began using the "Couch Doctor" and "Couch Doctor NYC" names to divert customers away from Couch Doctor Defendants and create marketplace confusion. For instance, Couch Doctor Defendants allege that Plaintiff purchased the "couchdoctor.com" domain name in September 2003 to prevent Couch Doctor Defendants from using it. (*Id.* ¶¶ 31-32.) According to Couch Doctor Defendants, Plaintiff did not set up an active website at "couchdoctor.com" until nearly a decade later, in 2012, and then, only in order to bolster its 2013 application to the USPTO for the COUCH DOCTOR® mark. (*Id.* ¶¶ 45-47.) Couch Doctor Defendants allege that they attempted to register the COUCH DOCTOR® and NEW YORK COUCH DOCTOR® marks in 2010 and 2011, respectively, but

3

withdrew their applications after Plaintiff opposed them, to avoid the high costs associated with opposition proceedings. (*Id.* ¶¶ 22, 23.) Plaintiff then filed its own application for the COUCH DOCTOR® mark in 2013, representing in its USPTO application oath that it was unaware of any persons or entities with a right to use the "Couch Doctor" name. (*Id.* ¶¶ 47, 54.) The USPTO granted Plaintiff's application for the COUCH DOCTOR® mark in February 2014. (*Id.* ¶ 50.)

## DISCUSSION

### I. LEGAL STANDARD

The parties bring these cross-motions to partially dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). Rule 12(b)(6) provides for the dismissal of a complaint based on a plaintiff's failure "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To withstand a motion to dismiss pursuant to Rule 12(b)(6), a complaint must plead facts sufficient "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In evaluating a 12(b)(6) motion, a district court must accept the factual allegations set forth in the complaint as true, and draw all reasonable inferences in favor of the plaintiff. *See Nielsen*, 746 F.3d at 62; *Cleveland v. Caplaw Enter.*, 448 F.3d 518, 521 (2d Cir. 2006). The liberal notice pleading standard of Rule 8(a) only requires that a complaint set forth "a short and plain statement of the claim showing that the pleader is entitled to relief." *Twombly*, 550 U.S. at 555. Under Rule 8(a)(2), the complaint need not set forth "detailed factual allegations," but the plaintiff must present "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555. A complaint that "tenders 'naked assertion[s]' devoid of 'further factual enhancement'" will not suffice. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 555 U.S. at 557). Rather, "[f]actual allegations must be enough to raise a right to relief above the

4

speculative level[.]" *Twombly*, 550 U.S. at 555. A complaint should be dismissed where a plaintiff has not "nudged [its] claims across the line from conceivable to plausible[.]" *Id.* at 570.

## II. N.Y. GEN. BUS. LAW SECTIONS 349, 350

Plaintiff's Fifth and Sixth Causes of Action assert violations of New York General Business Law Sections 349 and 350, which prohibit "[d]eceptive acts or practices" (Section 349) and "false advertising" (Section 350) in "the conduct of any business, trade or commerce or in the furnishing of any service in this state." N.Y. Gen. Bus. Law §§ 349, 350. Plaintiff alleges that Defendants' deceptive acts and practices "have caused and will continue to cause actual consumer confusion" (Fifth Cause of Action) and that their misleading advertising has "led consumers under false pretenses to retain Defendants' services instead of [Plaintiff's]" (Sixth Cause of Action). (Compl. ¶¶ 133, 137.) Couch Doctor Defendants contend that these are harms associated with garden-variety trademark infringement claims, which courts in the Second Circuit have routinely found to lie outside the ambit of Sections 349 and 350. The Court agrees.

Sections 349 and 350 are consumer protection devices directed at wrongs against the consuming public. *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 24 (1995). The critical question in assessing whether a *competitor* can state a claim under these statutes is "whether the matter affects the public interest in New York." *Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 264 (2d Cir. 1995) ("[T]he gravamen of the complaint must be consumer injury or harm to the public interest.") (internal citations omitted); *see also Gucci Am., Inc. v. Duty Free Apparel, Ltd.*, 277 F. Supp. 2d 269, 273 (S.D.N.Y. 2003) ("Commercial claimants under § 349 must allege conduct that has 'significant ramifications for the public at large' in order to properly state a claim.") (internal citations omitted). The Second Circuit has observed that "[i]njury or harm that satisfy this standard include 'potential danger to

5

the public health or safety.'" *Gucci*, 277 F. Supp. 2d. at 273; *see also Sports Traveler, Inc. v. Advance Magazine Publishers, Inc.*, No. 96-cv-5159, 1997 WL 137443, at *2–3 (S.D.N.Y. Mar. 24, 1997) (collecting cases). In *Securitron*, for instance, the Second Circuit found that the public interest was substantially affected where the plaintiff alleged that the defendant had provided false information regarding the plaintiff's products to a regulatory agency primarily concerned with public safety, causing it to undertake unnecessary investigations and diverting its resources. 65 F.3d at 264–65.

By contrast, courts in this Circuit "have routinely dismissed trademark claims brought under Sections 349 and 350 as being outside the scope of the statutes, because ordinary trademark disputes do not 'pose a significant risk of harm to the public health or interest' and are therefore not the type of deceptive conduct that the statutes were designed to address." *Kaplan, Inc. v. Yun*, 16 F. Supp. 3d 341, 352 (S.D.N.Y. 2014) (collecting cases). Rather, for a trademark claim to be cognizable under these provisions, there must be some "specific and substantial injury to the public interest over and above the ordinary trademark infringement [*i.e.*, general consumer confusion]." *Van Praagh v. Gratton*, 993 F. Supp. 2d 293, 305 (E.D.N.Y. 2014); *Perkins Sch. for the Blind v. Maxi–Aids, Inc.,* 274 F. Supp. 2d 319, 327 (E.D.N.Y. 2003) (noting that general consumer confusion is not a "direct harm to consumers").

Though Plaintiff's Complaint focuses on consumer confusion as the harm caused by Defendants' alleged infringement, Plaintiff argues in its opposition that its Complaint also alleges that Couch Doctor Defendants have "acted unprofessionally towards customers and members of the public to the point where its employees have been rejected from New York City residential buildings, deceived customers about accepted methods of payment, robbed members of the public by overcharging them for bogus 'credit card fees and taxes,' and harassed members of the public

to strong-arm them into paying in cash." (Dkt. 30 ("Pl.'s Opp'n") at ECF 5, 12.)[2] Plaintiff argues that it has thus alleged harm "above and beyond" consumer confusion. (*Id.* at ECF 12.) As Couch Doctor Defendants point out, however, these sweeping allegations are rooted in four paragraphs in Plaintiff's 158-paragraph-long Complaint and describe two discrete incidents. (*See* Pl.'s Opp'n at ECF 9-10 (citing Compl. ¶¶ 73, 74, 75, 78).) In the first incident, Plaintiff alleges that Couch Doctor Defendants gave one customer a hard time over paying by credit card, despite having previously agreed to accept credit card payment, and subjected the customer to a $70 surcharge. (Compl. ¶ 75.) Plaintiff alleges that Couch Doctor Defendants engaged in such unprofessional conduct while holding themselves out as Plaintiff, which "negatively affected this customer's perception of the Dr. Sofa mark," leading the customer to post a "scathing" review on Plaintiff's Yelp listing. (*Id.* ¶¶ 73-74, 76.) In the second incident, Plaintiff alleges that Couch Doctor Defendants' employees were thrown out of a building by the property manager while claiming to work for Plaintiff. (*Id.* ¶ 78.)

The Court finds that these two incidents fall far short of establishing "significant ramifications for the public at large," such as "potential danger to the public health or safety." *Gucci*, 277 F. Supp. 2d at 273. Rather, it is clear to this Court that the gravamen of Plaintiff's Complaint is harm to its own business interests arising from consumer confusion.[3] At its core,

---

[2] Citations to "ECF" refer to the pagination generated by the Court's electronic docketing system and not the documents internal pagination.

[3] *See 4 K & D Corp. v. Concierge Auctions, LLC,* 2 F. Supp. 3d 525, 548 n.13 (S.D.N.Y. 2014) ("[C]ourts routinely reject a competitor's Sections 349 and 350 claims if the gravamen of the complaint is . . . harm to plaintiff's business rather than harm to the public interest in New York at large."); *Gucci*, 277 F. Supp. 2d at 273 ("[D]isputes between competitors where the core of the claim is harm to another business as opposed to consumers . . . constitute situations which courts have found to reflect a public harm that is too insubstantial to satisfy the pleading requirements of § 349."); *Fashion Boutique of Short Hills Inc. v. Fendi USA, Inc.*, No. 91-cv-4544, 1992 WL 170559, at *4 (S.D.N.Y. July 2, 1992) (dismissing § 349 claim where "the gravamen of

7

Plaintiff's Complaint alleges that *Plaintiff's reputation* is harmed whenever a customer or member of the public has a one-off negative experience with Couch Doctor Defendants while mistaking them for Plaintiff, and publicizes these negative experiences on a site like Yelp.com.[4] (*See, e.g.*, Compl. ¶ 72 (prefacing the two incidents as examples of Couch Doctor Defendants' violations of Plaintiff's rights); *id.* ¶ 80 (concluding the foregoing conduct "has caused actual damage to The Sofa Doctor's names, marks and reputation")). Indeed, Plaintiff focuses on the impact on customer's *perception* of Plaintiff in the first incident, (*id.* ¶ 74), and does not even identify the nature of the harm suffered by the customer in the second (*id.* ¶ 78).

Accordingly, the Court dismisses the Fifth and Sixth Causes of Action from Plaintiff's Complaint. The Court additionally denies Plaintiff leave to amend its Complaint as Plaintiff, by its own admission, does not have additional facts sufficient to remedy the deficiencies of its Fifth and Sixth Causes of Action. (*See* Pl.'s Opp'n at ECF 5 ("This is just what Dr. Sofa knows now, without having taken any discovery.") and 10 (Plaintiff "has every reason to believe that during the course of discovery it will uncover additional evidence of similar or worse harm which NY Couch Doctor has inflicted on the general public.").)

---

Fashion Boutique's claim is harm to a store" and the "alleged harm to [the claimant's] business far outweighs any incidental harm to the public at large."); *LBF Travel, Inc. v. Fareportal, Inc.*, No. 13-cv-9143, 2014 WL 5671853, at *10 (S.D.N.Y. Nov. 5, 2014) (collecting cases).

[4] In the two cases Plaintiff relies on in support of its consumer protection claims, the crux of the allegations was that the defendants misappropriated the plaintiffs' reputation to deceive the public at large into purchasing the defendants' knock-off performances or items. (*See* Pl.'s Opp'n at ECF 8-9 (citing *Kuklachev v. Gelfman*, 600 F. Supp. 2d 437, 476 (E.D.N.Y. 2009) (noting that injury was evidenced by consumers demanding their money back after learning of the deception); *In re Houbigant*, 914 F. Supp. 964 (S.D.N.Y. 1995) (noting the defendants were part of a scheme to sell counterfeit goods and "deceive customers as to the source and origin of the products").) Neither case addressed whether the type of deception alleged in those cases rose to the level of harm "over and above" consumer confusion that is cognizable under Sections 349 and 350. In any event, Plaintiff's allegations do not even approach the broad harm to consumers alleged in *Kuklachev* and *Houbigant*, and is therefore distinguishable on that ground.

### III. TRADEMARK FRAUD COUNTERCLAIMS

Couch Doctor Defendants' Second and Third Counterclaims seek a declaratory ruling that Plaintiff committed fraud on the USPTO and cancellation of Plaintiff's registration of the COUCH DOCTOR® mark pursuant to 15 U.S.C. §§ 1064(3) and 1119. Specifically, Couch Doctor Defendants allege that Plaintiff's attorney fraudulently attested in the trademark application oath that he was aware of no other person or entity with a right to use the mark in commerce. (Countercl. ¶ 81.) To adequately plead fraud on the USPTO under this "fraud-in-the-oath" theory, Couch Doctor Defendants must allege particular facts, which, if proven, would establish that: "(1) there was in fact another use of the same or a confusingly similar mark at the time the oath was signed; (2) the other user had legal rights superior to applicant's; (3) applicant knew that the other user had rights in the mark superior to applicant's, and either believed that a likelihood of confusion would result from applicant's use of its mark or had no reasonable basis for believing otherwise; and [] (4) applicant, in failing to disclose these facts to the Patent and Trademark Office, intended to procure a registration to which it was not entitled." *Intellimedia Sports, Inc. v. Intellimedia Corp.*, 43 U.S.P.Q.2d 1203, 1997 WL 398344, at *2 (T.T.A.B. May 20, 1997) (internal citations omitted). Plaintiff contends that Couch Doctor Defendants fail to allege facts meeting the third and fourth prongs. The Court disagrees.

#### a. Couch Doctor Defendants Have Adequately Alleged That They Have Superior Rights In The "Couch Doctor" Mark

Though Plaintiff does not challenge the sufficiency of Couch Doctor Defendants' factual allegations that they possessed superior rights in the "Couch Doctor" mark, the Court finds it helpful to begin with an analysis of the parties' respective rights in the mark. "[T]rademark rights flow from priority and that priority is acquired through use." *ITC Ltd. v. Punchgini, Inc.*, 482 F.3d 135, 146 (2d Cir. 2007); *see also Haggar Int'l Corp. v. United Co. for Food Indus. Corp.*, 906 F.

Supp. 2d 96, 109 (E.D.N.Y. 2012) ("[T]rademark ownership rights attach to the first to use the mark in commerce."); *Gowanus Dredgers v. Baard*, No 11-cv-5985, 2013 WL 6667361, at *6 (E.D.N.Y. Dec. 17, 2013). "[S]o long as a person is the first to use a particular mark to identify his goods or services in a given market, and so long as that owner continues to make use of the mark, he is 'entitled to prevent others from using the mark to describe their own goods' in that market." *ITC Ltd.*, 482 F.3d at 146-47 (citing *Defiance Button Mach. Co. v. C & C Metal Prods. Corp.*, 759 F.2d 1053, 1059 (2d Cir. 1985) and *Sengoku Works v. RMC Int'l, Ltd.*, 96 F.3d 1217, 1219 (9th Cir. 1996)). "The 'talismanic test' for sufficient prior use in commerce is whether a person's use of the mark was 'sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark.'" *Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.*, 15 F. Supp. 2d 389, 396 (S.D.N.Y. 1998). This use must be "deliberate and continuous, not sporadic, casual or transitory." *La Societe Anonyme des Parfums Le Galion v. Jean Patou, Inc.,* 495 F.2d 1265, 1271-72 (2d Cir. 1974).

The Court finds that Couch Doctor Defendants have alleged sufficient facts to show that they were the first to use the "Couch Doctor" name in commerce in 2003 and have used the name continuously in commerce ever since. Couch Doctor Defendants allege that they began using the "New York Couch Doctor" name in spring of 2003, while Plaintiff was using the name "Dr. Sofa." (Countercl. ¶¶ 29-30.) They include in their Counterclaims an image of a business card with the name of "New York Couch Doctor" allegedly used and distributed by them in 2003. (*Id.* ¶ 14.) Couch Doctor Defendants also include in their Counterclaims other images of marketing materials that they have used over the years—a screenshot of their www.nycouchdoctor.com website in 2007, a marketing design they used in 2014, and a photo of their van—all using the "New York

Couch Doctor" name. (*Id.* ¶¶ 15, 16, 17.) They also cite examples of newspaper articles from 2008 through 2013 identifying their president, Giangrande, as "the Couch Doctor." (*Id.* ¶ 20.)

Couch Doctor Defendants separately allege that Plaintiff has never used the "Couch Doctor" name in commerce, but rather, only for the purpose of creating consumer confusion and diverting consumers away from Couch Doctor Defendants to Plaintiff. (*Id.* ¶ 44.) For instance, Couch Doctor Defendants allege that after learning of their use of the "Couch Doctor" name, Plaintiff purchased the domain name "www.couchdoctor.com" in September 2003, but left it inactive until 2011. (*Id.* ¶¶ 33-41.) Couch Doctor Defendants allege that from 2011 to 2012, Plaintiff activated the "www.couchdoctor.com" site, but even then, merely redirected traffic from it to their existing website, "www.drsofa.com." (*Id.* ¶ 41.) Couch Doctor Defendants further allege that Plaintiff did not publish an active website on "www.couchdoctor.com" until February or March 2012, and then, only in order to create evidence of its alleged use in commerce of the "Couch Doctor" mark to support its application to register that mark to the USPTO. (*Id.* ¶¶ 45-46.) Along with these allegations, Couch Doctor Defendants attach screenshots of the "www.couchdoctor.com" site in 2011, 2012, and 2014, at the time Couch Doctor Defendants' Answer was filed, as evidence of its inactive nature at those times. (*Id.* at ¶¶ 41, 42, 52.)

In light of the foregoing factual allegations, the Court finds that Couch Doctor Defendants have adequately alleged continuous and "sufficiently public" use of the "Couch Doctor" name in commerce since 2003. *Lane Capital*, 15 F. Supp. 2d at 396. Couch Doctor Defendants have moreover alleged facts that Plaintiff, by contrast, has not used the name in commerce as an identifying mark during these years. Accordingly, the Court finds that Couch Doctor Defendants have adequately alleged that they have superior rights in the "Couch Doctor" name.

### b. Couch Doctor Defendants Have Adequately Alleged That Plaintiff Knew Of Their Superior Rights In The "Couch Doctor" Mark, and Believed That Plaintiff's Use of the Mark Would Cause Confusion

With respect to the third prong, the Court finds that Couch Doctor Defendants have sufficiently alleged Plaintiff's knowledge of their superior rights to the "Couch Doctor" name, and believed that Plaintiff's use of the "Couch Doctor" name would cause confusion in the market.

Couch Doctor Defendants have alleged more than "a mere conclusory allegation that a defendant 'knew' about a plaintiff's superior rights." *See Intellimedia*, 1997 WL 398344, at *4 (citing the Fed. R. Civ. P. 9(b) standard). They have alleged facts showing that Plaintiff was aware of Couch Doctor Defendants' prior, longstanding, and continuous use of the mark, while itself making no use of the mark in commerce.[5] For instance, Couch Doctor Defendants have alleged that Plaintiff only acquired the "www.couchdoctor.com" domain after learning of the existence of Couch Doctor (Countercl. ¶¶ 27-31); that Plaintiff continued to do business under "Dr. Sofa" in the subsequent years and left the "www.couchdoctor.com" site inactive (and/or used the site to redirect traffic to "www.drsofa.com") (*Id.* ¶¶ 33-41); and that Plaintiff published an active webpage on "www.couchdoctor.com" in 2012 and disabled it in 2014 (*Id.* ¶¶ 45-52), permitting an inference that it was done solely for the purpose of supporting its 2013 application to register the Couch Doctor mark with the USPTO.

---

[5] The Court rejects Plaintiff's argument that the trademark right in dispute need have been established by prior agreement or court decree. (*See* Pl.'s Br. at ECF 13-14.) Rather, the standard is a disjunctive one: Couch Doctor Defendants need to show that Plaintiff knew that Couch Doctor Defendants had *either* superior rights *or* clearly established rights in "Couch Doctor" mark. *See Prof'l's Choice Sports Med. Prods, Inc. v. Eurow & O'Reilly Corp.*, No. 13-cv-1484, 2014 WL 524007, at *5 (S.D. Cal. Feb. 10, 2014). Thus, a senior, first-in-time user of a mark may establish its superior rights by demonstrating its longstanding and continuing use of a mark; a junior user of a mark, by contrast, would need to rely on "clearly established" rights such as prior agreement or court decree to establish that it possesses superior rights in the mark. *Id.*

Such allegations go beyond mere knowledge of another's prior use of a mark, which courts have found to be insufficient to show knowledge of another's superior rights. *Quiksilver, Inc. v. Kymsta Corp.,* 466 F.3d 749, 755–56 (9th Cir. 2006) (citing *Yocum v. Covington,* 216 U.S.P.Q. 210, 216–17 (T.T.A.B.1982) ("[T]he statement of an applicant that no other person 'to the best of his knowledge' has the right to use the mark does not require the applicant to disclose those persons whom he may have heard are using the mark *if he feels that the rights of such others are not superior to his.*") (emphasis in original)). This is not a situation where, in the course of registering a mark that it has been using in commerce, a party belatedly or unexpectedly *discovers* that another entity has also independently been using the mark, and believes in good faith that its own rights are superior. Rather, this situation involves a longstanding history of open competition between two companies.

The Court thus finds the allegations in this case distinguishable from those in the cases cited by Plaintiff, (Dkt. 31 ("Pl.'s Reply") at ECF 8-9),[6] and more akin to those in *Professional's*

---

[6] In three of the cases cited by Plaintiff, all of which involved a petition to cancel a trademark claim, the petitioners failed to allege facts suggesting that the registrant knew, or had reason to believe, that the petitioner's rights to the disputed marks were superior. *See Sovereign Military Hospitaller Order v. Fla. Priory of Knights Hospitallers of Sovereign Order*, 702 F.3d 1279, 1292 (11th Cir. 2012) (noting that the registrant's knowledge that the petitioner used the mark in question as of 1983 did not undermine registrant's claim to be the senior user of those marks because, even knowing of petitioner's existence, the registrant "could justifiably believe that its marks were superior based on their first use dating back to the 1920s"); *ZAO Odessky Konjatschnyi Zawod v. SIA Baltmark Invest*, No. 12-cv-515, 2013 WL 5945677, at *7 (E.D. Va. Nov. 6, 2013) (dismissing claim where petitioner alleged conclusorily, with no other factual allegations, that registrant "knew" the other user had a right to use the mark in question at the time of the oath); *Scooter Store, Inc. v. Spinlife.com, LLC*, 777 F. Supp. 2d 1102, 1112 (S.D. Ohio 2011) (finding that the registrant's knowledge of the petitioner's State trademark registration was insufficient to show the registrant's knowledge of petitioner's superior right, since a State trademark registration does not prevent another user from obtaining a federal trademark registration). In the other cases cited by Plaintiff, the petitioner failed even to allege that its rights were superior, let alone that the registrant knew that the petitioner's rights were superior. *See, e.g., Gibson Brands, Inc. v. John Hornby Skewes & Co.*, No. 14-cv-609, 2014 WL 5419512, at *5 (C.D. Cal. Oct. 23, 2014); *Bauer Bros. LLC v. Nike, Inc.*, No. 09-cv-500, 2011 WL 843971, at *5 (S.D.

*Choice Sports Medicine Products* and *Burnscraft Mfg. Corp. v. Nat'l Constr. Rentals, Inc.*, No. 13-cv-2769, 2014 WL 1386300 (S.D. Tex. Apr. 9, 2014). In both cases, the court found first that the plaintiff sufficiently alleged its superior right in the disputed mark by virtue of its prior continuous use of that mark. *See Prof'l's Choice*, 2014 WL 524007, at **5-6; *Burnscraft*, 2014 WL 1386300, at *5. In *Professional's Choice*, the court found the third prong satisfied where the plaintiff alleged, among other things, that one of the defendant's co-founders was aware of the plaintiff and its marks; the defendant adopted other product names imitating the plaintiff's; the two parties' products appeared in common distributor's catalog; and they had a competitor relationship in a field where the plaintiff was well-known. 2014 WL 524007, at *7-8. And in *Burnscraft*, the court found the third prong met where the plaintiff alleged that at the time registrant submitted its trademark application for the mark in dispute, it was aware of plaintiff's prior long and continuous use of the mark, based on the two companies having offered similar fencing services and promoted them through the same channels of trade. 2014 WL 1386300, at *5.

So too here, Couch Doctor Defendants and Plaintiff were direct competitors in a niche market, operating in the same New York Tri-State Area, and Plaintiff was almost certainly aware of Couch Doctor Defendants' existence from their inception. Indeed, Couch Doctor Defendants have alleged specific facts demonstrating that Plaintiff was not only aware of their use of the "Couch Doctor" name, but consciously acted to impede their use of the name throughout the subsequent decade after Couch Doctor Defendants began using the name.

These same factual allegations in Couch Doctor Defendants' Counterclaims, as well allegations in Plaintiff's own Complaint, are sufficient to establish the second part of the third

---

Cal. Mar. 8, 2011); *Military Order of Purple Heart Serv. Found., Inc. v. Others First, Inc.*, No. 12-143, 2012 WL 6761816, at *3 (D. Md. Dec. 28, 2012).

prong, *i.e.*, that Plaintiff believed that its use of the Couch Doctor name would cause confusion in the market. Indeed, the crux of Plaintiff's Complaint is that confusion was caused by Couch Doctor Defendants' use of the Couch Doctor mark. Thus, Plaintiff clearly knew that use of the Couch Doctor name—by any party—would cause confusion, even though Plaintiff claims that it, as the rightful owner of the mark, was the party harmed by the confusion.

Finally, the Court rejects Plaintiff's arguments that its opposition to Couch Doctor Defendants' two previous trademark applications in 2010 and 2011 constitutes *per se* proof that Plaintiff believed in good faith that it had a superior right to the "Couch Doctor" name, so as to preclude Couch Doctor Defendants from alleging otherwise now. (*See* Pl.'s Reply at ECF 13-17.) Accepting, as it must, Couch Doctor Defendants' allegations regarding the history of competition between the parties, and their respective trademark applications and claims with respect to the Couch Doctor name, the Court finds that Couch Doctor Defendants could establish that Plaintiff's oppositions of Couch Doctor Defendants' applications were themselves submitted in bad faith, *i.e.*, for the sole purpose of driving up Couch Doctor Defendants' costs of registering the trademark.[7] The Court similarly disregards Plaintiff's argument about the significance of the USPTO grant of trademark registration to Plaintiff for the Couch Doctor name, after denying registration to Couch Doctor Defendants twice before. These contrary arguments merely raise a factual dispute that cannot be resolved at this stage of the litigation, before discovery, and is more appropriately reserved for the summary judgment stage.

---

[7] Accordingly, the Court disregards the exhibits attached to Plaintiff's reply, consisting of papers filed in Couch Doctor Defendants' previous two trademark applications.

### c. Couch Doctor Defendants Have Adequately Alleged That Plaintiff Intended To Procure A Registration To Which It Was Not Entitled

The Court similarly finds that Couch Doctor Defendants have pled sufficient facts giving rise to an inference that Plaintiff *intended* to procure a registration to which it was not entitled. For instance, Couch Doctor Defendants allege that Plaintiff published an active website on the "www.couchdoctor.com" domain for the first time in 2012, shortly before it submitted a trademark application to the USPTO seeking registration of the "Couch Doctor" mark attaching a screenshot of the webpage. (Countercl. ¶¶ 45-49.) They allege that Plaintiff subsequently disabled the website in 2014 after successfully registering the COUCH DOCTOR® mark. (*Id.* ¶¶ 51-52.) Couch Doctor Defendants also allege that Plaintiff separately misrepresented in its 2013 USPTO application that it had used the "Couch Doctor" name as a trademark in commerce for ten years. (*Id.* ¶ 48.) These allegations permit an inference that Plaintiff manufactured evidence of its trademark use of the "Couch Doctor" name. Similarly, Couch Doctor Defendants have alleged other examples suggesting that Plaintiff has engaged in a conscious, longstanding practice of impeding Defendants' use of the "Couch Doctor" name, all while failing to make use of the name in commerce itself. (*See id.* ¶¶ 33-41 (alleging failure to use "www.couchdoctor.com" domain name for a decade); *id.* ¶¶ 64-65 (alleging manipulation of Google and Bing search results to display its "Dr. Sofa" site first when the phrase "Couch Doctor" is searched).)

The Court acknowledges that Couch Doctor Defendants face a heavy burden of proving knowledge and intent. As Plaintiff points out, "fraud in a trademark cancellation action is something that must be 'proved to the hilt' with little or no room for speculation or surmise; [there is] considerable room for honest mistake, inadvertence, erroneous conception of rights, and negligent omission[,] [with] any doubts resolved against the charging party." *Yocum*, 216 U.S.P.Q. at 216. Moreover, the USPTO oath "is phrased in terms of a subjective *belief*, such that it is

difficult, if not impossible, to prove falsity and fraud so long as the affiant or declarant has an honestly held, good faith belief." *Intellimedia*, 1997 WL 398344, at *3 (citing J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* (3d Ed. Dec. 1996) at Section 31:76) (emphasis in original). Nonetheless, at this juncture, the Court cannot conclude that Couch Doctor Defendants' allegations are insufficient to withstand a motion to dismiss.

## CONCLUSION

For all of the foregoing reasons, the Court GRANTS Couch Doctor Defendants' motion to dismiss Plaintiff's Fifth and Sixth Causes of Action and DENIES Plaintiff's motion to dismiss Couch Doctor Defendants' Second and Third Counterclaims.

SO ORDERED:

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: March 9, 2016
      Brooklyn, New York